**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| RAYSHAWN HAYNES,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>F. CONTREAS, *et al.*,<br><br>　　　　Defendants. | Case No. 1:22-cv-00536-JLT-EPG<br><br>FINDINGS AND RECOMMENDATIONS, RECOMMENDING THAT DEFENDANTS' MOTION FOR SUMMARY JUDGMENT BE GRANTED<br><br>(ECF No. 34)<br><br><br>OBJECTIONS, IF ANY, DUE WITHIN THIRTY DAYS |

　　　　Plaintiff Rayshawn Haynes is a state prisoner proceeding *pro se* and *in forma pauperis* in this civil rights action filed under 42 U.S.C. § 1983. (ECF No. 1). This case proceeds on Plaintiff's Eighth Amendment excessive force claims against defendants Cleveland, Luna, Cloud, Orozco, Chan, and Contreas, and his Fourteenth Amendment claim against defendant Rodriguez for unwanted medical treatment. (ECF Nos. 8, 12). Plaintiff alleges that he passed out in the shower, that officers then used excessive force on him, and that he was given medical treatment that he did not want.

　　　　Defendants have moved for summary judgment, arguing that the undisputed facts show that Defendants used force in a good-faith effort to restore or maintain order, and not maliciously and sadistically for the purpose of causing harm. Defendant also claim that those facts show that medication was used to ensure the safety of Plaintiff and others.

1

For the reasons explained below, it is RECOMMENDED that Defendants' motion for summary judgment be granted.

## I. PLAINTIFF'S COMPLAINT

Plaintiff's complaint in this case alleges as follows:

On July 24, 2020, Plaintiff was in the shower where he was housed (California State Prison-Wasco, Facility A, Building 5, C–Section). From what Plaintiff can remember, he felt light-headed and dizzy. Then everything went black. He regained consciousness, but he was still disoriented, his vision was blurry, his head was throbbing, and it seemed as if his whole body was in severe pain. Plaintiff remembers the sound of someone screaming at him, but he could not comprehend the words. Then, two correctional officers, defendants Cleveland and Luna, both started forcefully putting Plaintiff's hands behind his back. They twisted and bent his hands. Plaintiff was yelling and screaming to them, because it felt as if they were trying to break his hands. They did not listen. Then, defendant Luna started kneeing Plaintiff in his side, yelling what sounded like "stop fighting." Defendant Luna said this as a way to try to make sense of the cruel beating they were giving Plaintiff. The next thing Plaintiff knew, his mouth was bleeding from the use of force. Plaintiff was in so much pain and felt like he was going to pass out. He tried to tell the officers, but he was still disoriented and could not get words out properly. Plaintiff could see spots of blood coming out of his mouth. Plaintiff rolled onto his stomach. Defendant correctional officer Cloud and defendant Luna twisted each of his arms. Then defendant Cloud tightened the handcuffs so tight it caused Plaintiff's wrists to bleed. Defendant Orozco, a correctional officer, applied the restraints to his ankles so tight it caused both of his ankles to swell and bleed.

Plaintiff was placed and strapped on a medical gurney and was transported to the triage and treatment area. When Plaintiff arrived, defendant Catalano, a registered nurse, stabbed Plaintiff in his right arm so hard it caused instant pain to his entire forearm. Plaintiff tried to complain about the pressure defendant Catalano was while placing the IV line into Plaintiff's arm. However, instead of listening, defendant Chan, a correctional sergeant, grabbed a bag and placed it over Plaintiff's head. It felt like defendant Chan was attempting to suffocate Plaintiff. Then, defendant Cleveland started applying all of his body weight onto Plaintiff, and he tightened

the already too tight cuffs. Plaintiff does not know who, but it felt like someone grabbed Plaintiff by the neck.

The next thing Plaintiff knew, "the other nurse, Doctor Rodriguez" stabbed Plaintiff extremely hard in the thigh with a needle and injected Plaintiff with a chemical agent without his consent, and it caused Plaintiff to lose consciousness.

When Plaintiff regained consciousness, he was told by a doctor that he had a seizure due to lack of oxygen flowing to his brain, kidney failure, and a lack of water in his body. The doctor then let Plaintiff know that they had to clean his wounds and that the cuff marks were so deep that they may have to stitch them up if they keep hurting. The doctor also told Plaintiff that they have to clean the marks to avoid an infection.

However, after Plaintiff left the hospital, "Wasco did not help with them took picters [sic]." Plaintiff did not get any pictures. Plaintiff now has [illegible] on both wrists, arms, and ankles due to the restraints being applied too tightly. Also, Plaintiff still often feels pain and discomfort from the cuffs when he walks or does push-ups.

In its screening order, the Court found that the following claims should proceed past screening: Plaintiff's Eighth Amendment excessive force claims against defendants Cleveland, Luna, Cloud, Orozco, Chan, and Contreas and his Fourteenth Amendment claim against defendant Rodriguez for unwanted medical treatment. (ECF No. 8). Plaintiff agreed to proceed on his complaint and not file an amended complaint. (ECF No. 9). Plaintiff's remaining claims were dismissed. (ECF No. 18).

**II.     LEGAL STANDARDS**

**A. Summary Judgment**

Summary judgment in favor of a party is appropriate when there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Albino v. Baca*, 747 F.3d 1162, 1169 (9th Cir. 2014) (*en banc*) ("If there is a genuine dispute about material facts, summary judgment will not be granted."). A party asserting that a fact cannot be disputed must support the assertion by

> citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only),

3

> admissions, interrogatory answers, or other materials, or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."

Fed. R. Civ. P. 56(c)(1)(A)-(B).

A party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). "Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010). If the moving party does so, "the burden then shifts to the non-moving party to designate specific facts demonstrating the existence of genuine issues for trial," which is not a light burden, the party "must come forth with evidence from which a jury could reasonably render a verdict in the non-moving party's favor." *Id.*; *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."). "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322. Additionally, "[a] summary judgment motion cannot be defeated by relying solely on conclusory allegations unsupported by factual data." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).

In reviewing the evidence at the summary judgment stage, the Court "must draw all reasonable inferences in the light most favorable to the nonmoving party." *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 942 (9th Cir. 2011). It need only draw inferences, however, where there is "evidence in the record . . . from which a reasonable inference . . . may be drawn"; the Court need not entertain inferences that are unsupported by fact. *Celotex*, 477 U.S. at 330 n. 2 (citation omitted). And "[t]he evidence of the non-movant is to be believed." *Anderson*, 477 U.S. at 255. In reviewing a summary judgment motion, the Court may consider other materials in the record not cited to by the parties but is not required to do so. Fed.

R. Civ. P. 56(c)(3); *Carmen v. San Francisco Unified School Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001).

### B. Excessive Force

"In its prohibition of 'cruel and unusual punishments,' the Eighth Amendment places restraints on prison officials, who may not … use excessive physical force against prisoners." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). "[W]henever prison officials stand accused of using excessive physical force in violation of the [Eighth Amendment], the core judicial inquiry is . . . whether force was applied in a good-*faith* effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 6–7 (1992).

When determining whether the force was excessive, the Court looks to the "extent of injury suffered by an inmate . . . , the need for application of force, the relationship between that need and the amount of force used, the threat 'reasonably perceived by the responsible officials,' and 'any efforts made to temper the severity of a forceful response.'" *Hudson*, 503 U.S. at 7 (quoting *Whitley v. Albers*, 475 U.S. 312, 321 (1986)). While *de minimis* uses of physical force generally do not implicate the Eighth Amendment, significant injury need not be evident in the context of an excessive force claim, because "[w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated." *Hudson*, 503 U.S. at 9.

Unduly tight handcuffing can constitute excessive force. "In general, in cases where tight handcuffing was found to constitute excessive force, the plaintiff was in visible pain, repeatedly asked the defendant to remove or loosen the handcuffs, had pre-existing injuries known to the defendant, or alleged other forms of abusive conduct by the defendant." *Reviere v. Phillips*, 2014 WL 711002, at *6 (E.D. Cal. Feb. 21, 2014) (citing *Shaw v. City of Redondo Beach*, 2005 WL 6117549, at *7 (C.D. Cal. Aug. 23, 2005)).

### C. Unwanted Medication

"[A] competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment . . ." *Cruzan by Cruzan v. Dir., Mo. Dept. of Health*, 497 U.S. 261, 278 (1990). However, "determining that a person has a 'liberty interest' under the Due Process Clause does not end the inquiry; 'whether [a plaintiff's] constitutional rights have been violated

must be determined by balancing his liberty interests against the relevant state interests.'" *Cruzan*, 497 U.S. 261, 279 (1990) (footnote omitted) (quoting *Youngberg v. Romeo*, 457 U.S. 307, 321 (1982). Specifically, the Court must consider "the need for the governmental action in question, the relationship between the need and the action, the extent of harm inflicted, and whether the action was taken in good faith or for the purpose of causing harm." *Plumeau v. Sch. Dist. No. 40 County of Yamhill*, 130 F.3d 432, 438 (9th Cir. 1997) (citation omitted); *see also Jacobson v. Massachusetts*, 197 U.S. 11 (1905) (where the Supreme Court balanced an individual's liberty interest in declining an unwanted smallpox vaccine against the State's interest in preventing the disease). In the prison context, "[p]rison administrators have not only an interest in ensuring the safety of prison staff and administrative personnel, but also the duty to take reasonable measures for the prisoners' own safety." *Washington v. Harper*, 494 U.S. 210, 225 (1990) (citation omitted).

### III.  ANALYSIS OF EXCESSIVE FORCE CLAIM

**A. Defendant's Motion for Summary Judgment on Excessive Force Claim**

Defendants claim that the following facts related to Plaintiff's excessive force claim against Defendants Cleveland, Luna, Cloud, Orozco, Chan, and Contreas are undisputed:

- On Wednesday July 29, 2020, at approximately 1647 hours, Officer Cloud and Orozco observed Plaintiff laying on his back outside the lower shower in Facility A, Building 5, C-Section.

- Plaintiff was lying on his back and was unresponsive.

- Officer Orozco called a code 1 medical emergency and requested a medical gurney.

- Sergeant Contreras and Officer Luna responded to the Code 1 medical announcement.

- While medical staff was attending to Plaintiff, Plaintiff attempted to sit up, began swinging his arms and shouted "Get off me nigga!"

- Defendant Cloud ordered Plaintiff to place his hands behind his back. Defendant Cloud then attempted to apply the handcuffs.

- While Defendant Cloud attempted to apply handcuffs, Plaintiff began to pull his arm away from Defendant Cloud. Plaintiff ignored further commands to stop resisting and continued to pull his arms.

6

- Defendant Contreras restrained Plaintiff by grabbing Plaintiff's lower left and right legs.
- Defendant Orozco retrieved a set of leg irons and restrained Plaintiff's legs.
- Defendant Luna restrained Plaintiff's right arm. Defendant Cloud handcuffed Plaintiff. Plaintiff was then placed on a medical gurney and escorted to the Triage and Treatment Area ("TTA.")

(ECF No. 34–3). In support of these facts, Defendants have submitted declarations under penalty of perjury from Defendants Chan, Orozco, Cleveland, Contreras, and Luna. (ECF Nos. 35–6, 7, 9, 9, 10, 11).

Defendants also submit the deposition of Plaintiff in support of the following undisputed facts:

- On July 29, 2020, Plaintiff recalled that he was in the shower at Facility A, Building 5, C-Section, at Wasco State Prison. Plaintiff recalled leaving his cell and then waking up at a hospital.
- Plaintiff could not recall his actions, nor recall what actions the Defendants took.
- Plaintiff did not recall having any handcuffs applied or being escorted away from the showers.
- Plaintiff learned of the events and the names of the Defendants from reading the 115 reports.
- Plaintiff recalled that a spit mask was placed over him and someone gave him an injection while at the Triage and Treatment Area.
- After receiving the injection, Plaintiff then recalled regaining consciousness at a hospital.

(ECF No. 34–3, 34–4).

Based on these facts, Defendants contend that the undisputed facts show that Defendants used force in response to a threat Defendants reasonably perceived to themselves and Plaintiff. Had Defendants not used physical force and mechanical restraints to subdue Plaintiff, they would not have been able to safely transport him to the TTA for the necessary medical evaluation and treatment. (ECF No. 34–1 at 6).

\\\

\\\

**B.  Plaintiff's Response Regarding Excessive Force Claim**

Plaintiff's opposition regarding his excessive force claim relies entirely on a Crime/Incident Report because "Plaintiff could not attest to due to the fact that he maintains he does not recall as a result of his suffering from unconsciousness."[1]

Plaintiff claims those reports indicate the following sequence of events:

- Defendant Cloud accompanied by Defendant Orozco approached Plaintiff as he lied on 'his back outside the lower C Section shower.' Plaintiff appeared to be asleep.

- Both Defendant Cloud and Orozco then utilized their personal radio to request a Code 1 medical emergency and a medical gurney. Defendant Sergeant Contreas responded to the housing unit along with other correctional officers and medical staff.

- Defendant Contreas observed Plaintiff still lying on the ground and observed medical staff 'attempting to ask Haynes i.e., Plaintiff questions.' Defendants Cloud, Orozco and Contreas all then observed Plaintiff attempting to sit up from his lying position on the floor, clench his fist and began swing his arms in front of him. No correctional staff or medical staff were struck by Plaintiff as Plaintiff was still sitting on the ground and had just awakened from unconsciousness. All prison staff and employees were apparently standing around him as they observed his actions.

- After Plaintiff began swinging his arms in front of him, Defendant Cloud ordered Plaintiff to turn over onto a prone position on the ground and submit to handcuffs. Plaintiff complied and Defendant Cloud proceeded to place one cuff on Plaintiff's left wrist. After Defendant Cloud had placed the one cuff on Plaintiff's left wrist as Plaintiff was now on his stomach in a prone position, Plaintiff is alleged to have begun pulling his left hand away and trying to move away from Defendant Cloud while still on the ground. Defendant Cloud is then alleged to have used physical force to maintain control of Plaintiff's left hand and eventually was able to place Plaintiff in handcuff with his hands cuffed behind his back.

- While Defendant Cloud was engaged in using physical force on Plaintiff, Defendant Orozco having observed what was taking place went to the control booth and ask the control booth officer J. Waldrop to provide him with a set of leg restraints. While Defendant Orozco was retrieving the leg restraints Defendant Contreas was applying physical force on Plaintiff's lower limbs. By the time Orozco returned with the leg restraints Plaintiff was already in handcuffs.

---

[1] Minor typographical errors have been corrected.

- The Plaintiff was then placed in a gurney and escorted to the Triage Treatment Area (TTA) for evaluation and treatment.

(ECF No. 38, at p. 2–3).

Plaintiff argues that Defendants Cloud, Orozco, and Contreas did not follow protocol, which required them to put an unresponsive inmate in restraints. (ECF No. 38 at 3) ("Though the Plaintiff was clearly unconscious 'asleep' as two of the defendants claim, they did not apply any restraints on plaintiff or attempt to turn him on his side in accordance with standard medical practice for seizure patients to prevent them from swallowing their tongues and possibly choking to death."). Plaintiff also alleged that Defendants used force against him because they wrongly believed Plaintiff was being "disruptive," rather than that Plaintiff was acting unintentionally based on "his re-awakening from oblivion." (*Id.*)

Defendants also violated protocol by placing Plaintiff in handcuffs behind his back, and doing so in a way that caused him pain by cutting off his blood circulation. Moreover, by putting Plaintiff on his back when transporting Plaintiff to medical, Defendants caused Plaintiff comfort and breathing difficulties. As a result, Plaintiff states that he has suffered nerve damage to his right hand, and is now numb without feeling.

**C. Analysis of Excessive Force Claim**

Here, the facts are undisputed. Indeed, Plaintiff relies on Defendants' own statements of their actions as set forth in their crime incident reports because Plaintiff himself cannot recall the events. Thus, the Court finds that there is no genuine dispute as to any material fact regarding Plaintiff's excessive force claim.

Defendants are entitled to summary judgment on Plaintiff's claim for excessive force based on those undisputed facts. Those facts show that Defendants applied force in a good faith effort to restore discipline, rather than to maliciously and sadistically cause Plaintiff pain. According to Defendants' declarations and those reports, force was used after Plaintiff "became disruptive by clenching his fists and swinging them in front of his chest yelling 'Get away from me nigga.'" (ECF No. 38 at 8). After Defendant Cloud attempted to apply handcuffs, Plaintiff "began to pull away by turning and attempting to pull his left arm away." (*Id.*) Then Plaintiff "began to claw at [Cloud's] right wrist with his left fingernails scratching [Cloud's] right wrist."

9

(*Id.*) Finally, after Plaintiff was handcuffed, Defendants stopped using force. Thus, the undisputed facts establish a need for application of force and a perception by Defendants that Plaintiff was a threat at the time force was used.

Plaintiff's allegations regarding Defendants' use, or lack of use, of restraints also do not state a constitutional claim. Plaintiff first claims that Defendants failed to put handcuffs on him while he was unresponsive, in violation of prison protocol. However, a failure to restrain Plaintiff certainly does not state a claim for excessive force. Moreover, a violation of prison rules does not state a constitutional claim. *Cousins v. Lockyer* 568 F.3d 1063, 1070 (9th Cir. 2009) ("state departmental regulations do not establish a federal *constitutional* violation"). Furthermore, Plaintiff's allegation that Defendants later put the handcuffs on too tightly does not support his excessive force claim because Defendants put the handcuffs on when Plaintiff acted aggressively against them, and indeed fought Defendants' attempts to put on the handcuffs. (ECF No. 38 at 8) ("As I applied the handcuffs to his left wrist, Haynes began to pull away by turning his body away and attempting to pull his left arm away from me."). Plaintiff does not allege that he was in visible pain, repeatedly asked Defendants to loosen the handcuffs, or had pre-existing injuries known to Defendants. Given the undisputed facts, Plaintiff's allegation of damage from the handcuffs does not raise a question of material fact as to whether Defendants used excessive force in violation of the Eighth Amendment.

The Court thus recommends that Defendants' motion for summary judgment as to Plaintiff's excessive force claim be granted.

### IV.     PLAINTIFF'S CLAIM FOR UNWANTED MEDICAL TREATMENT

**A. Defendants' Motion Regarding Unwanted Medical Treatment Claim**

Turning to Plaintiff's Claim for unwanted medical treatment, Defendants submit that the following facts are undisputed:

- While in the TTA, Plaintiff began experiencing an apparent seizure. When Plaintiff recovered, he became agitated, started pulling against the restraints on him and twisting his body back and forth.

- Defendant Chan determined it was necessary to use force in order to maintain the safety of medical staff, and ensure Plaintiff received medical attention.

10

- Defendant Chan saw blood and saliva coming from Plaintiff mouth, and placed a spit hood over Plaintiff head.

- Defendant Chan instructed Officer Perez and Defendant Cleveland to restrain Plaintiff in order to prevent Plaintiff from getting injured and to protect medical staff.

- Defendant Cleveland attempted to physically control Plaintiff, by placing both hands on Plaintiff's left arm. Defendant Cleveland was able to cuff Plaintiff to the gurney.

- Registered Nurse Catalano contacted Dr. Rodriguez. R.N. Catalano informed Dr. Rodriguez that Plaintiff was unable to be subdued, and she could not administer an IV to Plaintiff.

- IV's are necessary in order to treat drug intoxication or overdose and to prevent potential risk of organ failure.

- Based on R.N Catalano's information, Dr. Rodriguez authorized RN Catalano to administer Ativan to Plaintiff.

- In order to prevent Plaintiff from seriously harming himself, and to ensure Plaintiff received medical attention, R.N. Catalano administered Ativan to Plaintiff.

- Plaintiff was then transported to a hospital outside of Wasco State Prison.

(ECF No. 34–3 at 4–6). Defendants' motion also includes a declaration from Defendant Dr. Rodriguez, who declares the following under penalty of perjury:

> I received a call about a medical emergency occurring at the Triage and Treatment Area from medical staff. I was advised that inmate Haynes was being combative and posed a threat to himself, medical staff, and officers. Registered Nurse Catalano was attempting to administer intravenous fluids to inmate Haynes because he had been found unresponsive in the housing unit showers and was agitated and combative.
>
> An IV is administered because, often we are worried about drug intoxication/overdose causing combative or extremely agitated behavior and possibly causing organ failure. Most of the time inmates refuse to reveal what drugs they have taken. IV fluids would be indicated to reduce risk of organ failure and allow easier medication administration as well as faster onset of action of medications administered intravenously. However, R.N. Catalano was unable to administer the fluids because of Haynes conduct. Medical staff in the TTA requested permission to administer an anxiolyic to calm Haynes down so that he could be further assessed and treated. I was not at the Triage and Treatment area and did not personally observe what occurred.

> Based on the information I received, I authorized R.N. Catalano to administer Ativan to Haynes.
>
> Ativan, also known as Lorazepam is a benzodiazepine medication. It is used to treat anxiety (including anxiety disorders), trouble sleeping, severe agitation, and active seizures.
>
> If an inmate requires medical attention, and is being combative and cannot be restrained or calmed, a psychotropic drug such as Ativan is often administered in order to calm the inmate.
>
> While there are potential risks from the use of Ativan, the benefit of administering the medication, so that the patient can be further assessed and treated, far outweighs those risks. This is especially true in this case because Haynes had experienced unexplained unconsciousness and was combative, both of which could have been caused by a serious medical issues and required immediate medical attention.
>
> At no time did I act with a conscious disregard for Hayne's medical needs. In fact, failing to administer Ativan would have meant that Haynes would have been at risk for further injury, or be unable to receive medical care.

(ECF No. 34–5).

Based on these facts, Defendants argue that Plaintiff's combative behavior constituted a medical emergency. Dr. Rodriguez's action in directing the use of Ativan was necessary and done in good faith to ensure the safety of Plaintiff, rather than to cause Plaintiff harm.

### B. Plaintiff's Opposition Regarding Unwanted Medication Claim

Plaintiff's opposition again relies on Defendants' own reports of the events at issue. Plaintiff argues that RN Catalano's report only described Plaintiff as shifting away, and not doing a marked change that would justify involuntary medication.

However, the report from RN Catalano that Plaintiff attaches to his opposition states in relevant part: "While attempting to start an IV on Haynes right arm, Inmate Haynes turned abruptly to his left causing my left arm to become caught between his arm, body, and waist restraints. Due to his movement, my left arm was hyperextended." (ECF No. 38 at 13).

Plaintiff also argues that he was restrained on the gurney at the time, and was not acting in anger.

Finally, he claims that Defendant Rodriguez should be liable because he could have asked more questions regarding Plaintiff's situation before authorizing medication against Plaintiff's will.

### C. Analysis of Plaintiff's Unwanted Medication Claim

The Court again finds no material dispute of fact as to this claim. Plaintiff himself relies on Defendants' own statement of events to support his position.

Based on these facts, Defendant Rodriguez is entitled to summary judgment. True, Plaintiff has a liberty interest in refusing unwanted medication. However, there was a need for the medication because R.N. Catalano was unable to administer fluids to reduce the risk of organ failure because of Plaintiff's conduct. Dr. Rodriguez used his medical judgment to determine that medication was needed to treat Plaintiff. Moreover, it does not appear that Plaintiff was harmed by administration of the medication. Taken as a whole, the undisputed facts establish that Dr. Rodriguez authorized the medication in good faith, rather than for the purpose of causing harm.

Thus, the Court recommends that Defendants' motion for summary judgment on this claim be granted.

## V. CONCLUSION AND RECOMMENDATIONS

For the reasons explained above, IT IS RECOMMENDED that:

1. Defendants' Motion for Summary Judgment (ECF No. 34) be GRANTED; and
2. the Clerk of Court be directed to close this case.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l). Within thirty (30) days after being served with these findings and recommendations, any party may file written objections with the Court. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any response to the objections shall be served and filed within fourteen (14) days after service of the objections.

\\\
\\\

The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal. *Wilkerson v. Wheeler*, 772 F.3d 834, 838–39 (9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated: **August 6, 2024**      /s/ Erica P. Grosjean
                              UNITED STATES MAGISTRATE JUDGE